UNITED STATES, Appellant

v

LEWIS W. BABBIDGE, Airman First Class,
U. S. Air Force, Appellee

18 USCMA 327, 40 CMR 39

No. 21,628

May 23, 1969

Colonel *James R. Thorn* and Major *Robert L. Bates* argued the cause for Appellant, United States.

Colonel *Joseph E. Krysakowski* argued the cause for Appellee, Accused. With him on the brief was Lieutenant Colonel *Samuel C. Wexler*.

Opinion of the Court

DARDEN, Judge:

This case presents the issue of whether an accused was denied the protection of Article 31 of the Uniform Code of Military Justice, 10 USC § 831, when he was required to submit to psychiatric evaluation by the Government as a condition precedent to

his presenting psychiatric testimony that would raise an issue of his mental responsibility.

Despite Babbidge's plea of not guilty, a general court-martial found him guilty of two offenses of wrongful communication of a threat by telephone, in violation of Article 134, Code, supra, 10 USC § 934. He was sentenced to confinement at hard labor for three months, forfeiture of $25.00 per month for three months, and reduction to the lowest enlisted grade. The convening authority approved the adjudged sentence. The board of review found the findings of guilty "incorrect in law and fact," and dismissed the charges and specifications.

Under the provisions of Article 67 (b) (2), Code, supra, 10 USC § 867, the Acting Judge Advocate General of the Air Force certified these two issues to the Court:

"I. WAS THE BOARD OF REVIEW CORRECT IN HOLDING THAT THE LAW OFFICER'S RULING, REQUIRING THE ACCUSED TO SUBMIT TO EXAMINATION BY GOVERNMENT PSYCHIATRISTS AS A CONDITION PRECEDENT TO THE ADMISSION OF DEFENSE PSYCHIATRIC EVIDENCE, VIOLATED THE PROVISIONS OF ARTICLE 31.

"II. WAS THE BOARD OF REVIEW CORRECT IN DETERMINING THAT THE PSYCHIATRIC DIAGNOSIS AND CONCLUSION OF THE SANITY BOARD WAS INADMISSIBLE AND PREJUDICIAL TO THE ACCUSED."

At the trial, after the Government had rested its case, the defense announced that its first witness would be a Dr. Natarajan. During a closed session that followed, the trial counsel related that since he had expected the accused to raise the issue of his mental responsibility at the trial, the trial counsel had attempted about two months before trial to have the accused evaluated psychiatrically in accordance with paragraph 121 of the Manual for Courts-Martial, United States, 1951. This examination was incomplete and a diagnosis was not made because the patient had been advised by his attorney not to co-operate fully. Consequently, the trial counsel moved that the testimony by the accused's own psychiatrist be excluded unless the accused submitted to psychiatric evaluation by the Government. The trial counsel emphasized that if the accused submitted to such an evaluation only the results of the evaluation and not any possibly incriminating statements would be entered into evidence. The law officer granted this motion. After a one-day continuance, defense counsel announced that "we have no alternative but to submit to psychiatric evaluation by the Government psychiatrist or a Government psychiatrist."

When the trial resumed more than a month later, a psychiatrist of the accused's choosing, Dr. Natarajan, testified that although the accused could distinguish right from wrong he was unable to adhere to the right at the time he made the threatening telephone calls. Dr. Natarajan's testimony contains several statements indicating the accused committed the offenses with which he was charged. In contrast, a stipulation furnished the bare conclusions of a Government sanity board that had functioned while the court was in recess; all board members concurred in findings that at the time of the offenses the accused was mentally competent, that he could adhere to the right, and that he had enough mental capacity to understand the nature of the proceedings against him and to conduct himself intelligently or cooperate in his defense. Nothing in this stipulation incriminated the accused in the sense of indicating that the accused had made any statements to the board that tended to prove he committed the offenses with which he was charged.

This Court has decided no case on precisely the issue this case presents. In United States v Biesak, 3 USCMA 714, 723, 14 CMR 132, the Court commented that whether an accused may be compelled to answer questions and to give information necessary for a psychiatric inquiry is "veiled in uncertainty."

The accused in United States v

Bunting, 6 USCMA 170, 19 CMR 296, was a person who cooperated with psychiatrists relied on by the defense, but upon the advice of counsel he refused to talk to members of a medical board appointed to evaluate his sanity. In *Bunting,* the issue of whether the accused had to be given an Article 31 warning by a psychiatrist was not decided because the Court thought it was not squarely presented. Two concurring opinions in that case expressed reservation whether "an accused person must be warned of his right to remain silent before examination by a psychiatrist who may later testify at his trial." *Id.,* at page 179.

In United States v Baker, 11 USCMA 313, 29 CMR 129, a majority of the Court affirmed a conviction despite testimony by a physician who did not advise the accused of his rights under Article 31 that the accused was a narcotics user. The dissenting Judge disagreed with the majority's conclusion that the accused was not suspected of an offense at the time of the examination and that the purpose of the inquiry was not to establish guilt. In both *Bunting* and *Baker, dicta* stated that Government psychiatrists must give an accused an Article 31 warning before questioning.

Government experts who had not warned the accused in accordance with Article 31 testified at the trial in United States v Malumphy, 12 USCMA 639, 31 CMR 225. This Court decided in a unanimous opinion that when the psychiatrists saw the accused he was not a suspect within the meaning of Article 31 and consequently the lack of warning was harmless. Acting on a petition for new trial, a majority of the Court denied the petition in a memorandum opinion, indicating that the experts appearing for the Government testified only as to their evaluations of the accused and not to any statements made by him. They reaffirmed their belief that accused was not a suspect in the eyes of the psychiatrists. A dissent to the denial of the petition expressed the view that a hearing should be conducted to determine whether there had been deliberate suppression of evidence that the accused had been committed to the hospital for a determination of his mental responsibility instead of solely for medical purposes. United States v Malumphy, 13 USCMA 60, 32 CMR 60.

We now turn to the subject at hand.[1] Under the military rule stated in paragraph 122a, Manual for Courts-Martial, United States, 1951, the defense of insanity has a preferred status. The burden of proving the sanity of the accused is always on the prosecution. Insanity has been set apart as something different from an affirmative defense. It is not a mitigating circumstance but is, instead, a complete defense to a crime. United States v Burns, 2 USCMA 400, 9 CMR 30.

Section 4244 of Title 18, United States Code, provides a procedure by which a person charged with an offense against the United States may be examined on his mental condition. If the United States Attorney has reasonable cause to believe that the person is insane or is so mentally incompetent as to be unable to understand the proceedings against him or to assist in his own defense, the court may require an examination by at least one qualified psychiatrist. This section also provides that:

". . . No statement made by the accused in the course of any ex-

---

[1] It has been suggested that United States v Kemp, 13 USCMA 89, 32 CMR 89, is applicable to the case at bar. To the contrary, it is totally unrelated for *Kemp* waived no statutory or constitutional right. Indeed, he claimed his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831, by refusing to speak of his offense at a psychiatric board proceeding. This fact was thereafter put in evidence at his trial. Thus, the issue in *Kemp* centered upon the action of trial counsel in eliciting from a Government psychiatrist testimony that an accused had claimed his rights under Article 31 when before the board.

amination into his sanity or mental competency provided for by this section, whether the examination shall be with or without the consent of the accused, shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding."

In Pope v United States, 372 F 2d 710 (CA 8th Cir) (1967), reversed on other grounds, 392 US 651, 20 L Ed 2d 1317, 88 S Ct 2145 (1968); see also 397 F 2d 812 (CA 8th Cir) (1968), the United States Court of Appeals for the Eighth Circuit held that by raising the issue of insanity, by submitting to psychiatric and psychologic examination by defense's own examiners, and by presenting evidence as to mental incompetency, the defense in a prosecution for bank robbery and murder raised the issue of insanity for all purposes. The Government was appropriately granted leave to have the defendant examined by experts of its choice and to have such opinions placed in evidence.

After indicating that at that time there was no Federal case precisely in point in this area, and after careful consideration of the opposing arguments urged by the defense, the court concluded:

". . . Whether one frames his approach in terms of waiver or of fundamental fairness buttressed with appropriate protective instructions, see State v Whitlow, supra, we fail to perceive any constitutional violation or prejudicial error in what the trial court did here. Certainly, the criminal trial is still a search for truth subject, of course, to constitutional guaranties. It would be a strange situation, indeed, if, first, the government is to be compelled to afford the defense ample psychiatric service and evidence at government expense and, second, if the government is to have the burden of proof, as it does with the competency issue in the case, Davis v United States, 160 US 469, 486, 488, 16 S Ct 353, 40 L Ed 499 (1895), and yet it is to be denied the opportunity to have its own corresponding and verifying examination, a step which perhaps is the most trustworthy means of attempting to meet that burden. Yet that is precisely what the defense claims is appropriate here." [Id., at page 720.]

In State v Whitlow, 45 NJ 3, 210 A 2d 763, 770 (1965), the New Jersey court made this observation:

". . . An accused who asserts lack of criminal guilt because of insanity and who fully cooperates with psychiatrists engaged by him for examination purposes, answering all questions put to him including those relating to the crime itself, ought not to be allowed to frustrate a similar comprehensive examination by the State by asserting the bar against self-incrimination. He ought not to be able to advance the claim and then make the rules for determination of the claim."

In Alexander v United States, 380 F 2d 33, 39 (CA 8th Cir) (1967), the United States Court of Appeals for the Eighth Circuit thought that:

"It would violate judicial common sense to permit a defendant to invoke the defense of insanity and foreclose the Government from the benefit of a mental examination to meet this issue. . . . [I]n Battle v Cameron, 260 F Supp 804, 806 (D.D.C. 1966), [the court] observed:

'To place the burden of proof on this issue on the Government and at the same time to deprive the Government of an opportunity for a mental examination of the defendant, would lead to an absurdity and would be a travesty on justice.' "

United States v Albright, 388 F 2d 719 (CA 4th Cir) (1968), is a case in which the facts are strikingly similar to those in the case at bar. After the defendant had presented psychiatric testimony to support his defense of insanity at the time of trial, the Government obtained, over defendant's objection, an order to require him to submit to a psychiatric examination.

The defendant contended, *inter alia,* that his Fifth Amendment right against self-incrimination was violated when he was required over his objection to submit to such an examination. The Court of Appeals for the Fourth Circuit pointed out that section 4244 of Title 18, United States Code, has no literal application where the defendant pleads he was insane at the time of the commission of an alleged offense except where the claim of previous insanity may provide reasonable cause to believe there is present insanity. The court said that:

"Even if resort to § 4244 might not have properly been had, the principle seems established that a district court in a criminal case has inherent power to require a psychiatric examination of a defendant, where the defendant has pleaded insanity as a defense, submitted to examination by examiners of his own choosing and presented testimony to support his defense." [*Id.,* at page 722.]

Continuing, the court declared:

"The manifest purpose of the examination in this case was, and the proper objective of a mental examination in any criminal case where a defendant's sanity is in issue should be, to obtain knowledge not about facts concerning defendant's participation in the criminal acts charged, but about facts concerning a defendant which are themselves material to the case. Cf. United States v Wade, 388 US 218, 219, 222, 87 S Ct 1926, 18 L Ed 2d 1149 (1967). The purpose is not to prove by evidence wrested from a defendant whether he is guilty as charged but, rather, to prove whether a defendant possesses the requisite mentality to be guilty as charged, assuming that his guilt is otherwise established, or whether, legally, he cannot be held criminally responsible, irrespective of what other proof may establish he has done. The 'testimonial' or 'communicative' test of what is and what is not within the privilege against self-incrimination, invoked in Sch-

merber v State of California, 384 US 757, 86 S Ct 1826, 16 L Ed 2d 908 (1966), is not an appropriate distinction to be applied in the case at bar, but that test is not absolute because, as stated in *Schmerber,* it is only 'a helpful framework for analysis,' and '(T)here will be many cases in which such a distinction is not readily drawn.' 384 US 764, 86 S Ct 1832." [*Id.,* at page 723.]

Later, in this same opinion, the court summarized:

"Lastly, we comment that the purpose and result of the examination is not 'the cruel, simple expedient of compelling it (incriminating evidence) from his own mouth.' To repeat an earlier statement, the purpose of the examination is not to determine whether a defendant did or did not do the criminal acts charged, but whether he possessed the requisite mental capacity to be criminally responsible therefor, if other proof establishes that he did do them. So limited, we find nothing in the examination, over a defendant's objection, to violate a defendant's privilege against self-incrimination." [*Id.,* at page 725.]

A court-martial does not have to invoke inherent power to compel a psychiatric examination of an accused who desires to introduce evidence of his insanity at the time of an alleged offense.

Under paragraph 121 of the Manual for Courts-Martial, supra, an accused must be referred to a board of medical officers that includes at least one psychiatrist when there is substantial basis for belief the accused is insane or was insane at the time of the alleged offense. Such a board makes separate findings on whether the accused (1) can distinguish right from wrong, (2) can adhere to the right, and (3) can understand the nature of the proceedings against him and cooperate in his defense. The board must examine the accused in discharging its responsibility under this paragraph of the Manual, which also provides that "Such additional mental examinations may be directed at any

stage of the proceedings as circumstances may require."

Paragraph 121 of the Manual was promulgated by the President under authority delegated to him by Article 36 of the Uniform Code of Military Justice, 10 USC § 836. Such a delegation is valid, and the paragraph has the force and effect of law. United States v Smith, 13 USCMA 105, 32 CMR 105. In instances where the accused first raises the issue of insanity, paragraph 121 is not, to our knowledge, in conflict with the Constitution, the Uniform Code of Military Justice, or any other statute. This is true even though Article 31, supra, has been held to be broader in its protection against self-incrimination than is the Fifth Amendment to the Constitution. United States v Musguire, 9 USCMA 67, 25 CMR 329; United States v White, 17 USCMA 211, 38 CMR 9. We should apply this paragraph and construe Article 31 in a manner that gives effect to the manifest purposes of each, that comports with "fundamental fairness" and that maintains a " 'fair state-individual balance.' " Pope v United States, supra; Miranda v Arizona, 384 US 436, 460, 16 L Ed 2d 694, 86 S Ct 1602 (1966).

If the procedure followed in this case is disapproved, the Government, in shouldering its burden of proof, would have to establish that the accused was mentally responsible through only (1) testimony by lay persons, (2) cross-examination of psychiatrists testifyng for the accused, and (3) testimony by military psychiatrists or physicians founded on courtroom observations, hypothetical questions, or both. The limitations of these methods were recognized in the court's opinion in United States v Albright, supra:

". . . Medical science, as Rollerson v United States, 119 US App DC 400, 343 F 2d 269 (1964), eloquently recognizes, deems these poor and unsatisfactory substitutes for testimony based upon prolonged and intimate interviews between the psychiatrist and the defendant.

Half truths derived from these unsatisfactory substitutes do more to violate human personality than full disclosure, especially because there is always the possibility that the psychiatrist who examines for the government and thus has full knowledge of a defendant, may corroborate his contention that he is legally insane." [388 F2d 719, 725.]

The absence of expert testimony, and reliance solely upon the cross-examination of defense experts, can result in a holding that prosecution failed to meet its burden of proof. Frigillana v United States, 113 App DC 328, 307 F2d 665 (CA DC Cir) (1962).

We think that neither the Congress, the President, nor this Court, separately or in concert, intended to require a result that "violate[s] judicial common sense," or is "a strange situation, indeed," "a travesty on justice," or "an absurdity." Those terms have been used in the decisions mentioned, supra, describing a situation when the defendant who invokes the defense of insanity refuses to submit to a mental examination by the Government with the Government holding the burden of proof.

In this case, the stipulation contains only the fact of a sanity hearing and the findings of the sanity board. We hold that in these circumstances, the Article 31 rights of the accused were not violated by requiring him to submit to an examination. We conclude also that the board of review was incorrect in holding that the law officer's ruling violated the provisions of Article 31 and that the psychiatric diagnosis and conclusions of the sanity board were inadmissible and prejudicial to the accused.

When the accused opened his mind to a psychiatrist in an attempt to prove temporary insanity, his mind was opened for a sanity examination by the Government. His action constituted a qualified waiver of his right to silence under Article 31.

Only a disingenuous argument could suggest that questioning of the accused did not contribute to the diagnosis that was admitted in evidence by stipulation. But we note the absence of any showing that anything Babbidge may have said tended to prove he committed an offense. Accordingly, we cannot agree with the board of review that the bare conclusion of the sanity board could be characterized as a "link in the chain of evidence used against him." In our view, it operates, at most, as a diminution of the effectiveness of a defense of insanity.

The certified questions are answered in the negative. The decision of the board of review is reversed. The record of trial is returned to the Acting Judge Advocate General of the Air Force for resubmission to a board of review. The board of review may take such action as is not inconsistent with this opinion.

Chief Judge QUINN concurs.

FERGUSON, Judge (dissenting):

I dissent.

I had thought, until the advent of this opinion, that one accused of crime had an *unqualified* right to refuse to give testamentary evidence against himself under the Fifth Amendment to the Constitution and Article 31, Uniform Code of Military Justice, 10 USC § 831. However, my brothers now hold this right to be *qualified by the need of the Government* to perfect its evidence in rebuttal to an accused's defense of insanity. The door has now been opened to other similar qualifications and I do not perceive how it can be closed short of reversal of this opinion.

The situation which presented itself at the time the law officer directed the accused to cooperate with the Government's psychiatrists, as a condition precedent to presenting his own psychiatric evidence, is the same as that underlying the question presented in United States v Kemp, 13 USCMA 89, 32 CMR 89. As did this accused, Kemp claimed his rights under Article 31

and refused to discuss the offense with the Government's psychiatrists. As a result, the sanity board was unable to determine whether Kemp was capable of forming the degree of intent, willfulness, malice, or premeditation called for by the offense charged. Subsequent to defense evidence relating to the issue of Kemp's sanity, the Government presented witnesses who disclosed the fact of Kemp's refusal to cooperate and of his reliance on his right against self-incrimination. As the Court stated in *Kemp*, at page 97:

"The question before us is whether an accused who has claimed *a right guaranteed to him, which springs from the Constitution and is expanded and implemented by statute,* may have the fact that he invoked such privilege disclosed against him upon his trial." [Emphasis supplied.]

We reversed Kemp's conviction for premeditated murder on the ground that "[t]he action of trial counsel in developing the fact that accused had claimed the protection of Article 31 was highly prejudicial to the accused." *Ibid.*, at page 100.

It goes without saying, that, if one has *a right guaranteed by the Constitution,* he may not be deprived of that right as a condition precedent to the exercise of another right, also guaranteed by the Constitution—that of presenting the testimony of his own witnesses. United States v Clay, 1 USCMA 74, 1 CMR 74. See also the Constitution of the United States, Amendment 6; Article 46, Code, supra, 10 USC § 846; United States v Sweeney, 14 USCMA 599, 34 CMR 379. Notwithstanding my brothers' footnote reference to *Kemp,* I do not perceive how the underlying rationale of that case—an accused's *unqualified* right to remain silent in such circumstances—can be distinguished from the case at bar. It seems to me that if trial counsel could not comment on Kemp's refusal to cooperate with the Government's psychiatrists, it is clear that he could not be ordered to do so. If, as the majority now hold, that right is not un-

**333**

qualified, and Kemp could have been ordered to cooperate with the Government's psychiatrists, if only the prosecution had thought to petition the law officer or the convening authority for such an order (see paragraph 121, Manual for Courts-Martial, United States, 1951), then we were guilty of gamesmanship by not calling attention to that fact and *Kemp* should be overruled. However, no one involved in Kemp's trial or in the appellate proceedings, including myself, apparently believed that such an order, having as its purpose assistance to the Government in the perfection of its case, would have been valid. In my opinion, an order under such circumstances would be illegal as in contravention of a constitutional right and Article 31.

As a matter of proper procedure, a serviceman may be ordered by his superiors to submit to a physical, including mental, examination, and his refusal to comply may be the subject of charges under the Code. United States v Koch, 17 USCMA 79, 37 CMR 343. But when he is suspected of an offense, an order of this nature would be in violation of Article 31, if the result, obtained against his will, would incriminate or tend to incriminate the accused.

In the case at bar, the accused, following his reliance on Article 31, was ordered by the law officer to answer questions of the Government psychiatrist, even "as these might relate to the offense." Only a disingenuous argument could suggest that this subsequent questioning did not contribute to the diagnosis that was admitted in evidence or that the diagnosis did not depend upon questioning concerning the offenses charged, for the reason given for failure to render a psychiatric determination following the original interview was the accused's refusal, on advice of counsel, to discuss the charges. It matters not that the diagnosis did not tend to prove that the accused committed an offense. Any evidence obtained in violation of the privilege against self-incrimination is inadmissible (United States v Price, 7 USCMA 590, 23 CMR 54; Miranda v Arizona, 384 US 436, 16 L Ed 2d 694, 86 S Ct 1602 (1966); United States v Tempia, 16 USCMA 629, 37 CMR 249), including evidence used in rebuttal to a defense of insanity. Cf. United States v Lincoln, 17 USCMA 330, 38 CMR 128. Since accused's conviction was materially supported by this diagnosis, prejudice is apparent. United States v Stephen, 15 USCMA 314, 35 CMR 286; United States v Kemp, supra.

Concededly, the civilian court cases cited by my brothers[1] in support of their view, hold that a person's right not to incriminate himself, under the Fifth Amendment to the Constitution, is not violated *per se* by requiring him to submit to a mental examination. But this Court has always held that Article 31 is broader in its protection of the accused serviceman (United States v Musguire, 9 USCMA 67, 25 CMR 329; United States v White, 17 USCMA 211, 38 CMR 9), and we have not hesitated to apply this view, even in areas where the Supreme Court has held to the contrary. Cf. United States v White, supra, with Gilbert v California, 388 US 263, 18 L Ed 2d 1178, 87 S Ct 1951 (1967). Military due process accords to an accused the unqualified right to remain silent (United States v Clay, supra). There is nothing in Article 31 which even hints that this right might be subordinated to the needs of the Government, or, as rationalized in Pope v United States, 372 F 2d 710 (CA8th Cir) (1967), to that which the court there referred to as "fundamental fairness" and in United States v Albright, 388 F2d 719 (CA4th Cir) (1968), as the need to maintain a " 'fair state-individual balance.' " The decision in *Pope*, incidentally, is still in the process of appeal (397 F2d 812), and the statement in *Albright* that the "maintenance of a 'fair state-individual balance' clearly required that

---

[1] Pope v United States, 372 F2d 710 (CA8th Cir) (1967), reversed on other grounds, 392 US 651, 20 L Ed 2d 1317, 88 S Ct 2145 (1968); United States v Albright, 388 F2d 719 (CA4th Cir) (1968); Alexander v United States, 380 F2d 33 (CA8th Cir) (1967); State v Whitlow, 45 NJ 3, 210 A2d 763 (1965).

the government be permitted to have defendant examined" (388 F2d, at 724), is obviously misplaced. This quotation was taken from the following language of Miranda v. Arizona, supra, as set forth in the margin in *Albright* at page 724:

" "* * * the privilege against self-incrimination—the essential mainstay of our adversary system—is founded on a complex of values, Murphy v Waterfront Comm., 378 US 52, 55–57, n. 5, 84 S Ct 1594, 1596–1597, 12 L Ed 2d 678 (1964); Tehan v (United States ex rel) Shott, 382 US 406, 414–415, n. 12, 86 S Ct 459, 464, 15 L Ed 2d 453 (1966). All these policies point to one overriding thought: the constitutional foundation underlying the privilege is the respect a government—state or federal—must accord to the dignity and integrity of its citizens. To maintain a "fair state-individual balance," to require the government "to shoulder the entire load," 8 Wigmore, Evidence 317 (McNaughton rev. 1961), to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth. Chambers v (State of) Florida, 309 US 227, 235–238, 60 S Ct 472, 476–477, 84 L Ed 716, 722 (1940). In sum, the privilege is fulfilled only when the person is guaranteed the right "to remain silent unless he chooses to speak in the unfettered exercise of his own will." Malloy v Hogan, 378 US 1, 8, 84 S Ct 1489, 1493, 12 L Ed 2d 653 (1964).' 384 US 460, 86 S Ct 1620."

Any fair reading of the *Miranda* language leads to the exact opposite conclusion as that drawn in *Albright*.

Encroachments on constitutional rights have a long history of rejection by the courts. As long ago as 1866, Mr. Justice Bradley, speaking of the Fourth and Fifth Amendments to the Constitution, wrote in Boyd v United States, 116 US 616, 635, 29 L Ed 746, 6 S Ct 524 (1886):

". . . It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely: by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon."

No amount of equivocating language or specious reasoning, such as that used in the civilian cases cited by my brothers, to reach their results, can obscure the fact that those holdings are a serious and unjustified encroachment on a fundamental right guaranteed by the Constitution. It illbehooves this Court to adopt, for the system of military justice, a rationalization so obviously contrary to the plain language of *Miranda*, that:

". . . our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth. Chambers v Florida [supra]." [384 US, at page 460.]

I do not base my opinion solely on the greater scope of protection afforded by Article 31. Rather, I believe that the privilege against self-incrimination, guaranteed by the Fifth Amendment to the Constitution, is *unqualified* and transcends any needs of the Government to enhance its prosecutorial evidence. Cf. Counselman v Hitchcock, 142 US 547, 563, 35 L Ed 1110, 1114, 12 S Ct 195 (1892), wherein the Court stated:

". . . The privilege is limited to

**335**

criminal matters, but it is as broad as the mischief against which it seeks to guard."

We heard argument on this case on the following questions certified to this Court by the Acting Judge Advocate General of the Air Force:

"I. WAS THE BOARD OF REVIEW CORRECT IN HOLDING THAT THE LAW OFFICER'S RULING, REQUIRING THE ACCUSED TO SUBMIT TO EXAMINATION BY GOVERNMENT PSYCHIATRISTS AS A CONDITION PRECEDENT TO THE ADMISSION OF DEFENSE PSYCHIATRIC EVIDENCE, VIOLATED THE PROVISIONS OF ARTICLE 31.

"II. WAS THE BOARD OF REVIEW CORRECT IN DETERMINING THAT THE PSYCHIATRIC DIAGNOSIS AND CONCLUSION OF THE SANITY BOARD WAS INADMISSIBLE AND PREJUDICIAL TO THE ACCUSED."

I would answer these questions in the affirmative.